1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17

| | |
|---|---|
| MARISA MARTINEZ, an individual,<br><br>                                     Plaintiff,<br><br>v.<br><br>COSTCO WHOLESALE<br>CORPORATION, an unknown business<br>entity; and DOES 1 through 25, inclusive,<br><br>                                     Defendant. | Case No.:  19CV1195-GPC(WVG)<br><br>**ORDER GRANTING IN PART AND<br>DENYING IN PART DEFENDANT'S<br>MOTION FOR PARTIAL<br>SUMMARY JUDGMENT**<br><br>**[DKT NO. 21.]** |

18
19
20
21
22

       Before the Court is Defendant Costco Wholesale Corporation's motion for partial summary judgment filed on June 5, 2020.  (Dkt. No. 21.)  On July 10, 2020, Plaintiff filed a response, and on July 24, 2020, Defendant filed a reply.  (Dkt. Nos. 23, 25.)  After a review of the briefs, supporting documentation, and the applicable law, the Court GRANTS in part and DENIES in part Defendant's motion for partial summary judgment.

23

### Procedural Background

24
25
26
27
28

       On June 26, 2019, the case was removed to this Court.  (Dkt. No. 1.)  Plaintiff Marisa Martinez ("Plaintiff" or "Marisa") filed a complaint against Defendant Costco Wholesale Corporation ("Defendant" or "Costco"), her former employer, on state law claims for (1) discrimination on the basis of a physical disability pursuant to California

1

Government Code section 12940(a); (2) failure to accommodate pursuant to California Government Code section 12940(m) and California Code of Regulations, title 2, section 11068(a); (3) failure to engage in the interactive process pursuant to California Government Code section 12940(n) and California Code of regulations, title 2, section 11069(a); (4) retaliation and wrongful constructive termination pursuant to California Government Code section 12940(h); (5) failure to prevent discrimination pursuant to California Government Code section 12940(k); (6) retaliation pursuant to California Labor Code section 1102.5; (7) negligent supervision; and (8) intentional infliction of emotional distress.  (Dkt. No. 1-2, Compl.)  Defendant moves for partial summary judgement on all causes of action except for her second claim for failure to accommodate.  (Dkt. No. 21.)

## FACTUAL BACKGROUND

### 1.  Plaintiff's Employment at Costco

Plaintiff was employed at Costco since 1993 until her resignation in March 2019. (Dkt. No. 23-1, P's Response to D's SSUF, Nos. 1, 46.)  In October 1993, Defendant hired Plaintiff as a front-end clerk at its Kearny Mesa location.  (Dkt. No. 21-5, McConnell Decl., Ex. 1, Martinez Depo. at 73:13-21.)  In 1997, Plaintiff moved to Defendant's San Diego Regional Office to work as an Inventory Control Specialist ("ICS") for five years.  (*Id.* at 74:7-18.)  In 2002, Plaintiff became an Assistant Buyer for another five years and was promoted to Buyer in the Mexico Buying-Softlines Department in February 2007.  (*Id*. at 74:19-75:15.)  Both Assistant Buyer and Buyer were management-level positions.  (*Id.* at 99:9-14.)

As a Buyer, Plaintiff reported to General Merchandise Manager ("GMM") Julie Daleo ("Daleo") who supervised Plaintiff for 12 years and provided her annual performance evaluations.  (Dkt. No. 23-4, Gruenberg Decl., Ex. 2, Daleo Depo. at 19:19-20:4.)  Daleo testified that Plaintiff was an employee who "did an excellent job" and had a "great relationship with the home office, imports departments, and international teams." (*Id*. at 20:15-18; 38:14-18.)  Daleo reported to Vice President GMM, Steve Mantanona

("Mantanona").  (Dkt. No. 23-1, P's Response to D's SSUF, No. 7.)  Daleo and Mantanona were both involved in the decision to hire Plaintiff as a buyer.  (Dkt. No. 23-4, Gruenberg Decl., Ex. 2, Daleo Depo at 19:13-18.)  Beginning in March 2018, Mantanona reported to Executive Vice President Russ Miller ("Miller"), who replaced retiring Dennis Zook ("Zook").  (Dkt. No. 23-1, P's Response to D's SSUF, No. 8.)

The job posting for the Buyer position at the time Plaintiff became a Buyer provided the following description: "Identifies product, and negotiates terms of purchase and delivery for items to be sold in U.S. outlets of a membership warehouse chain. Tracks item performance.  Oversees and directs activities of Assistant Buyer and Inventory Control Specialist.  Travels to attend trade shows, location openings, and business meetings."  (Dkt. No. 21-5, D's App'x, Ex. 6 at 278.)  As it related to travel duties, the job posting also provided: "Travels by air and auto for 3-5 day trips 6-10 times per year, with occasional trips of 7-10 days, to attend trade shows, location openings, regional meetings, factory tours, and other business meetings."  (*Id.*)

It was not until an email dated August 29, 2018 and formally in a memorandum on November 8, 2018 that Plaintiff was informed that travel to Mexico three times a year was an essential duty of her position.  (Dkt. No. 23-3, Gruenberg Decl., Ex. 1, Martinez Depo. at 306:5-11; Dkt. No. 21-5, D's App'x, Ex. 8 at 283; *id.*, Ex. 14 at 302-03.) However, during the 12 years she was a buyer, Plaintiff stated she competently performed her job duties despite only going to Mexico seven times.  (*Id.* at 306:19-307:8.)  She explained she received high marks on her reviews and made her numbers without having to go down to Mexico three times a year.  (*Id.* at 308:3-13.)  There were other buyers who had not been to Mexico in eight and five years, yet they were not challenged for not traveling to Mexico.  (*Id.* at 308:12-309:7.)  Daleo similarly testified that Plaintiff had been able to conduct her work competently by communicating with the staff in Mexico as well as buyers through email, messaging, phone, Facetime, and/or Zoom.  (Dkt. No., 23-4, Gruenberg Decl., Ex. 2, Daleo Depo. at 104:16-105:2.)  Daleo

stated Plaintiff was able to perform most of her essential job functions without having to travel to Mexico.  (*Id.* at 201:16-202:16.)

**2.      Plaintiff's Disability and Travel Concerns**

According to her doctor on January 17, 2019, Plaintiff was diagnosed with "a significant history of severe anxiety with panic attacks."  (Dkt. No. 21-5, D's App'x, Ex. 19 at 322.)  In that letter, her doctor reported that Plaintiff "has an extreme fear of travel to Mexico which is exacerbating her panic attacks."  (*Id.*)  On November 19, 2018, Plaintiff was first diagnosed with depression.  (Dkt. No. 23-1, P's Response to D's SSUF, No. 64.)

Plaintiff testified that Michelle Martinez, the GMM's Assistant, knew she had anxiety and hypertension and Daleo, the GMM, knew she had anxiety, and they both knew she had a medical diagnosis of anxiety but Plaintiff does not recall when she informed them.  (Dkt. No. 23-3, Gruenberg Decl., Ex. 1, Martinez Depo. at 193:6-8; 194:1-18.)  But they knew about her diagnosis before November 26, 2018.  (*Id.* at 286:18-25.)  Mantanona knew she was nervous as he would call her "Nervous Nellie" all the time, so she assumed he knew she had anxiety.  (*Id.* at 193:11-15; 287:2-10.)  In addition, when Plaintiff did presentations, she would tell him she was "nervous" but acknowledged that she did not tell him she had a medical diagnosis of anxiety.  (*Id.* at 193:16-25.)

Daleo testified she learned that Plaintiff suffered from anxiety 12 years ago and knew she was fearful of her safety while traveling to Mexico due to the heightened crimes against business travelers.  (Dkt. No. 23-4, Gruenberg Decl., Ex. 2, Daleo Depo. at 17:17-21; 45:16-46:23.)  She testified that before Mantanona denied her request for travel to New York on August 29, 2018, he knew that Plaintiff did not want to travel to Mexico due to safety concerns.  (Dkt. No. 23-4, Gruenberg Decl., Ex. 2, Daleo Depo. at 71:13- 73:6.)

Mantanona testified that he first learned that Plaintiff suffered from anxiety in January or February 2019.  (Dkt. No. 21-5, McConnell Decl., Ex. 3, Mantanona Depo. at

19CV1195-GPC(WVG)

21:2-7.)  He also stated he did not make a comment about her nervousness to present in August 2016 in front of upper management, denied making a comment during a trip to Mexico that people should not mess with Plaintiff because she was scared to be there, and denied making the "Nervous Nellie" comment.  (*Id.* at 21:8-24.)

As a Buyer for twelve years, Plaintiff had traveled to Mexico seven times.  (Dkt. No. 23-3, Gruenberg Decl., Ex. 1, Martinez Depo. at 306:19-307:2.)  Plaintiff testified that, at some point during her time as Buyer and during a trip to Mexico with Zook and Mantanona, "the fourth car in [her] caravan got boxed in and stopped and held up by gunpoint and robbed."  (*Id.* at 130:3-12.).  Plaintiff testified that she first raised safety concerns about travel to Mexico with Mantanona in 2010 due to the reported unrest in the country. (Dkt. No. 23-3 at 31, Gruenberg Decl., Ex. 1, Martinez Depo. at 115:13-25).  At that time, Plaintiff approached Mantanona separately after a trip had been cancelled and asked about policies and procedure Costco had in place if something were to happen, but he blew her off and said nothing was going to happen.  (*Id.* at 115:24-116:15.)  On another occasion, Mantanona made fun of her and told people not to mess with Marisa because she was scared of being in Mexico.  (*Id.* at 116:16-24.)

### 3.   Acts of Alleged Discrimination and Retaliation

On August 20, 2018, Plaintiff submitted a travel authorization form for a trade show in New York from October 8-11, 2018 for approval by Daleo and Mantanona.  (Dkt. No. 23-3, Gruenberg Decl., Ex. 1, Martinez Depo. at 105:13-106:12; 107:9-25; Dkt. No. 21-5, D's App'x, Ex. 7 at 180.)  On August 28, 2018, Daleo informed Plaintiff that Mantanona was not going to approve any of her travel until she goes to Mexico.  (Dkt. No. 23-3, Gruenberg Decl., Ex. 1, Martinez Depo. at 108:4-16; Dkt. No. 23-4, Gruenberg Decl., Ex. 2, Daleo Depo. at 66:17-25.)  At that time, Plaintiff was the only member of the buying staff that Mantanona told he would not approve travel until they arranged travel to Mexico.  (Dkt. No. 23-4, Gruenberg Decl., Ex. 3, Mantanona Depo. at 31:2-5.)

On August 29, 2018, Plaintiff emailed Mantanona about the denial of her travel authorization.  (Dkt. No. 21-5, D's App'x, Ex. 8 at 283.)  She wrote, "Do I need to

schedule a trip to Mexico before my future travel is approved?" (*Id.* at 282.)  In response to her email, he answered in the affirmative and stated he has asked all buyers and assistant buyers to visit their markets at least 3 times a year and Mantanona set up a meeting later that same day for himself, Plaintiff, Daleo, and her assistant, Michelle Martinez. (*Id.* at 282-83.)  During the meeting, Plaintiff expressed her desire for detailed itineraries, travel in groups with a Spanish speaker and men, and if available, an armored car. (Dkt. No. 23-1, P's Response to D's SSUF, No. 13; Dkt. No. 23-3, Gruenberg Decl., Ex. 1, Martinez Depo. at 140:16-144:19.)  At the end of the meeting, Mantanona recapped Plaintiff's concerns and said he would get back to her as soon as possible. (Dkt. No. 23-3, Gruenberg Decl., Ex. 1, Martinez Depo. at 143:18-24.)  After the meeting, Plaintiff testified that nobody got back to her about a safety protocol or her safety concerns. (*Id.* at 147:3-15; 148:25-149:17.)  She acknowledged Daleo called her into her office for 3 minutes to review her concerns so Mantanona could get back to her. (*Id.* at 147:6-15.)  Daleo went over the list with her but she never got a copy of it. (*Id.*)  In addition, nobody specifically told her these were the safety protocols that were going to be implemented. (*Id.* at 147:16-18.)

On the other hand, Mantanona states that after the August 29, 2018 meeting, he helped to prepare a set of travel protocols to Mexico which was emailed to Daleo on September 4, 2018. (Dkt. No. 21-4, Mantanona Decl. ¶ 3; Dkt. No. 21-5, D's App'x, Ex. 10 at 288.)  He explained that most of the protocols were already being used for travel to Mexico but had not been put in writing. (Dkt. No. 21-4, Mantanona Decl. ¶ 3.)  In response to Mantanona's email dated September 4, 2018 directing Daleo to go over the protocols with Plaintiff, Daleo confirmed that she would meet with Plaintiff. (Dkt. No. 21-4, Mantanona Decl. ¶ 3; Dkt. No. 21-5, D's App'x, Ex. 10 at 288.)  On October 15, 2018, when Mantanona emailed Daleo to confirm she had met with Plaintiff and reviewed the protocols with her, Daleo confirmed she "sat down & reviewed each point with her." (Dkt. No. 21-4, Mantanona Decl. ¶ 4; Dkt. No. 21-5, D's App'x, Ex. 11 at 292-93.)

Daleo testified that she met with Plaintiff on September 4, 2018 and verbally went over the protocols with Plaintiff. (Dkt. No. 21-5, McConnell Decl., Ex. 4, Daleo Depo. at 76:2-80:1.) Basically, Daleo read off the bullet points of safety protocols in Mantanona's email from her computer screen. (*Id.* at 77:2-12.) Daleo stated she did not specifically inform Plaintiff that these were the protocols that would be implemented. (*Id.* at 77:14-16.) But she informed her that the portion with the "counterpart in place" was being implemented. (*Id.* at 81:5-8.) The protocol was not provided to the buyer's staff in writing. (*Id.* at 85:22-25.) During that visit, they also called Denise Koslowski for guidance on how to use the SOS link on the website. (*Id.* at 87:8-15.)

After Mantanona denied her trip to New York, Plaintiff began planning a trip to Mexico with three coworkers to view competitors and locations in Tijuana and Ensenada. (Dkt. No. 23-3, Gruenberg Decl., Ex. 1, Martinez Depo. at 124:6-25.) Daleo informed Plaintiff that when she told Mantanona that Plaintiff was planning a trip to the Tijuana location, he responded the trip would not count as a trip to Mexico. (*Id.* at 125:1-25.) She had to go to Mexico City. (*Id.*; Dkt. No. 23-4, Gruenberg Decl., Ex. 2, Daleo Depo. at 101:3-7.) Daleo testified that she thought Mantanona's response that going to a border town would qualify as a trip to Mexico was odd because other buyers would go to Tijuana and Ensenada for their trips to Mexico. (Dkt. No. 23-4, Gruenberg Decl., Ex. 2, Daleo Depo. at 101:2-14.)

On October 11, 2018, because Plaintiff had not heard back from Mantanona and he now claimed a trip to Tijuana did not count as a trip to Mexico, on October 11, 2018, Martinez reached out to the Executive Vice President Russ Miller to arrange a meeting. (Dkt. No. 23-3, Gruenberg Decl., Ex. 1, Martinez Depo. at 150:25-151:11; Dkt. No. 21-5, D's App'x, Ex. 9 at 285.) On October 15, 2018, Miller met with Plaintiff. (Ex. 23-3, Gruenberg Decl., Ex. 1, Martinez Depo. at 150:12-17.) At the meeting, Miller gave her a copy of the email dated September 4, 2018 from Becky Meda listing Mexico travel protocols and Miller stated he believed it was emailed to the entire San Diego staff. (*Id.* at 155:6-22; *see also* Dkt. No. 21-5, D's App'x, Ex. 12 at 298.) When Miller handed her

7

the email, he stated that these are the Mexico travel protocols. (Dkt. No. 23-3, Gruenberg Decl., Ex. 1, Martinez Depo. at 158:50-7.) The email states, "All employees should adhere to the following protocols when traveling internationally:" and lists nine bullet points. (Dkt. No. 21-5, D's App'x, Ex. 12 at 298.) When Plaintiff received the printed email at the meeting with Mr. Miller, it was a surprise to her since she had never seen it before. (Dkt. No. 23-3, Gruenberg Decl., Ex. 1, Martinez Depo. at 156:7-10.) Later, when she asked seven other buyers, they indicated they had never seen the memo and that they would like a copy of it. (*Id.* at 156:11-17.) Plaintiff testified that the protocols in that email would have been sufficient for her to fly commercially to Mexico. (*Id.* at 157:15-24.)

On October 31, 2018, the Buyer employees were advised by email of a mandatory meeting on November 2 to discuss international travel to Mexico. (Dkt. No. 23-1, P's Response to D's SSUF, No. 21.) Due to bronchitis, Plaintiff missed the November 2 meeting. (*Id.*, No. 23.) Ultimately, Plaintiff did not see any of the materials that were shown during this meeting. (Dkt. No. 23-3, Gruenberg Decl., Ex. 1, Martinez. Depo. at 166:3-25.)

On November 8, 2018, Plaintiff met with Mantanona, Daleo and Michelle Martinez and was given a memorandum (the "November 8 Memo") that emphasized the importance of traveling to Mexico as a Mexico Buyer and explained that going forward, Plaintiff would need to travel to Costco's Mexico City office at least three times per year, and if she was unwilling to travel, she would not be fulfilling her job responsibilities as a Mexico Buyer. (Dkt. No. 21-5, D's App'x, Ex. 14 at 302-03.) The memo also stated that she had four weeks to make a decision and if she could not fulfill her job responsibility, then she had 60 days to find another open position at Costco that did not require travel to Mexico. (*Id.* at 303.) If she was unable to locate another position, then she would be transitioned to the ICS position at the San Diego Regional Office and could continue to look for open positions. (*Id.*) After she read the memo in front of them, she disputed the accuracy of the contents of the memo and could not believe they were going to demote

here especially in light of the fact that they said they would get back to her.  (Dkt. No. 23-3, Gruenberg Decl., Ex. 1, Martinez. Depo. at 168:14-169:14.)  After the meeting, Plaintiff went to talk to Daleo explaining her position that "this was a bunch of lies and that she's implicated in these lies by saying that [Daleo] thoroughly reviewed the precise protocols with [her] in a meeting" and Daleo responded that she agreed with Plaintiff and said she would set up a meeting to talk with Mantanona and Miller that day.  (*Id.* at 170:7- 171:11.)  Daleo returned after talking to Miller and informed Plaintiff that Miller stated that the memo was him "getting back to her."  (*Id.* at 171:15-172:5.)

According to Mantanona, the November 8, 2019 memo was to recap Costco's efforts to address Plaintiff's concerns about traveling to Mexico and to reiterate the expectation and importance of traveling to the Mexico City Office.  (Dkt. No. 21-4, Mantanona Decl. ¶ 5.)  If she did not want to travel to Mexico regularly, then there were other options for her which included looking for other positions within the company and if none were available, transitioning as an ICS where she could continue to work for Costco and still be able to search for job openings.  (*Id.*)

Plaintiff then scheduled a trip to Mexico City leaving November 27, 2018 with Miller and Mantanona.  (Dkt. No. 23-1, P's Response to D's SSUF, No. 27.)  Later, Plaintiff canceled the trip because she requested and was approved medical leave for anxiety and depression starting November 19, 2018 through January 14, 2019.  (*Id.*, Nos. 27, 28; Dkt. No. 21-5, D's App'x, Ex. 15 at 305; *id.,* Ex. 16 at 307; *id.*, Ex. 17 at 314.)  Plaintiff later returned to work on January 14, 2019 "without restriction" based on a note from her doctor, Dr. Brian Lenzkes, dated January 9, 2019.  (*Id.*, No. 29; Dkt. No. 21-5, D's App'x, Ex. 18 at 320.)  In another noted dated January 17, 2019, Dr. Lenzkes stated Plaintiff suffers from "history of severe anxiety with panic attacks" and that it is not recommended that Plaintiff travel to Mexico which is exacerbating her panic attacks.  (Dkt. No. 21-5, D's App'x, Ex. 19 at 322.)  Dr. Lenzkes testified that when he wrote his initial note stating "without restriction," he assumed she would not travel to Mexico.  (Dkt. No. 21-5, D's App'x, Ex. 43, Lenzkes Depo. at 67:7-24.)

On January 25, 2019, Plaintiff received a letter from Cindy Schmertzler, Costco's Director of Integrated Leave, asking for clarification about her leave restrictions and inquired about possible alternative accommodations that would allow her to travel to Mexico.  (Dkt. No. 21-5, D's App'x, Ex. 21 at 326.)  On January 30, 2019, Plaintiff responded to Schmertzler's email and attached a doctor's note dated January 29, 2019 stating that she should not travel to Mexico for six months or until she feels that appropriate safety measures are taking place.  (*Id.*, Ex. 23 at 338-40.)

On January 28, 2019, Daleo lodged a complaint, on behalf of Plaintiff, claiming retaliation against Miller and Mantanona with Schmertzler.  (Dkt No. 23-4, Gruenberg Decl., Ex. 2, Daleo Depo. at 207:4-25.)  Brenda Weber ("Weber"), the Vice President of Human Resources, investigated the complaint.  (Dkt No. 23-4, Gruenberg Decl., Ex. 2, Daleo Depo. at 208:15-25.)  On a phone call with Weber, Plaintiff "briefly described the retaliation she endured from Mantanona, including the denial of trade show travel, the demotion memo, and the travel protocol memo that was never sent out."  (Dkt. No. 23-3, Gruenberg Decl., Ex. 1, Martinez Depo. at 243:14-245:4.)  Weber did not interview Daleo which she testified she thought was odd.  (Dkt. No. 21-5, McConnell Decl., Ex. 1, Martinez Depo. at 261:18-262:4; Dkt. No. 23-4, Gruenberg Decl., Ex. 2, Daleo Depo. at 209:1-21.)  In an email dated February 8, 2019, Weber wrote her findings and concluded "there was no evidence that Plaintiff had been retaliated against for bringing up travel concerns or evidence that she had been treated improperly in any other matter."  (Dkt. No. 21-5, D's App'x, Ex. No. 27 at 355.)

On February 11, 2019, Plaintiff spoke with Schmertzler on the phone about her accommodations, and in an email dated February 13, 2019, Schmertzler memorialized the conversation and explained that travel to Mexico was an essential duty of her Mexico Buyer position.  (Dkt. No. 21-5, D's App'x Ex. No. 28 at 357.) They also talked about any open and available positions that she could do temporarily that would not require travel to Mexico but there were none in San Diego.  (*Id.*)  As such, she was going to be

placed on a leave of absence for six months which would begin at the end of the following week.  (*Id.*)

After this conversation with Schmertzler, Plaintiff went and saw her doctor, Dr. Lenzkes, because she was stressed and overwhelmed.  (Dkt. No. 23-3, Gruenberg Decl., Ex. 1, Martinez Depo. at 272:22-274:13.)  In a doctor's note dated February 22, 2019, Dr. Lenzkes noted that due to her current work situation she was having worsening insomnia and panic attacks and he recommended that she take an immediate medical leave of absence to focus on her anxiety and health.  (Dkt. No. 21-5, D's App'x, Ex. No. 30 at 362.)  She emailed Daleo the doctor's note on February 23, 2019.  (Dkt. No. 21-5, D's App'x, Ex., No. 31 at 364.)  In a letter dated February 28, 2019, Schmertzler informed Plaintiff that due to the February 22, 2019 doctor's note, her request for a medical leave of absence was approved as of February 25, 2019.  (Dkt. No. 21-5, D's App'x, Ex., No. 32 at 366.)  Schmertzler also invited Plaintiff to discuss her doctor's opinion that Plaintiff would need to remain out on leave until there was a "mutually acceptable agreement with her employer" regarding travel protocols to Mexico.  (*Id.*)  That was the last communication between Plaintiff and Costco.

Beginning in December 2018, Plaintiff began to apply to other jobs including the University of San Diego ("USD").  (Dkt. No. 23-1, P's Response to D's SSUF, No. 45.)  On February 14, 2019, Plaintiff received and accepted a contingent job offer from USD.  (*Id.*, No. 46.).  When her background check cleared and all contingencies were had been cleared, on March 7, 2019, Plaintiff informed Costco by email that she was resigning her employment "effective immediately."  (*Id.*)

### Discussion

### A.   Legal Standard on Motion for Summary Judgment

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986).  Summary judgment is appropriate if the "pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp.,* 477 U.S. at 323. The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. *Id.* at 322-23. If the moving party fails to bear the initial burden, summary judgment must be denied, and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324. If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Id.* at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. *Anderson*, 477 U.S. at 255.

**B.     First Cause of Action - Disability Discrimination under FEHA**

Defendant argues the claim for disability discrimination under California Government Code section 12940(a) fails because (1) Plaintiff did not suffer an adverse

employment action, and (2) it can articulate non-discriminatory reasons for its actions. (Dkt. No. 21-1 at 19-23.)  Plaintiff counters that she (1) suffered "actionable adverse employment actions," and (2) can show that Defendant's alleged legitimate reasons are pretextual.  (Dkt. No. 23 at 17-20.)

Under California's Fair Employment and Housing Act ("FEHA"), it is unlawful for an employer "to discriminate against the [employee] in compensation or in terms, conditions, or privileges of employment" due to the employee's physical or mental disability.  Cal.  Gov't Code § 12940(a).  To establish a prima facie case of disability discrimination under FEHA, a plaintiff must show "(1) [she] suffers from a disability; (2) [she] is otherwise qualified to do his job; and, (3) [she] was subjected to adverse employment action because of [her] disability." *Faust v. Cal. Portland Cement Co.*, 150 Cal. App. 4th 864, 886 (2007).  "An adverse employment decision cannot be made 'because of' a disability, when the disability is not known to the employer." *Avila v. Cont'l Airlines, Inc*., 165 Cal. App. 4th 1237, 1247 (2008) (quoting *Brundage v. Hahn*, 57 Cal. App. 4th 228, 236 (1997)); *see also Yanowitz v. L'Oreal USA, Inc*. (2005) 36 Cal.4th 1028, 1046 (2005) (no FEHA retaliation claim "where there is no evidence the employer knew" that the employee was engaging in protected conduct).

"California has adopted the three-stage burden-shifting test established by the United States Supreme Court [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)] for trying claims of discrimination . . . based on a theory of disparate treatment." *Guz v. Bechtel Nat. Inc.,* 24 Cal. 4th 317, 354 (2000).[1]  "Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying [their] own statutes." *Guz*, 24 Cal. 4th at 354.

Under *McDonnell Douglas Corp*., the plaintiff has the initial burden of establishing a prima facie case of discrimination.  411 U.S. at 802-04.  Once a prima facie case is

---

[1] Both parties cite to *McDonnell Douglas* to support their position; therefore, the parties do not dispute that Plaintiff is alleging discrimination based on disparate treatment, not disparate impact.

19CV1195-GPC(WVG)

shown, a presumption of discrimination arises and the burden shifts to the defendant to show that the adverse employment action was taken for a legitimate, non-discriminatory or non-retaliatory reason. *Id.* Stating a legitimate, non-discriminatory, non-retaliatory reason negates the presumption of discrimination and shifts the burden back to the plaintiff to demonstrate that the proffered reason was a pretext for discrimination. *Id.*

At trial, the plaintiff employee generally has the initial burden of establishing a prima facie case of discrimination. *Dep't of Fair Employment & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 745 (9th Cir. 2011) (addressing FEHA disability claim). However, the burden is reversed when a defendant employer moves for summary judgment. *Id.* To prevail on a motion for summary judgment, the employer must show either that the "(1) plaintiff could not establish one of the elements of [the] FEHA claim or (2) there was a legitimate, nondiscriminatory reason for its decision to terminate plaintiff's employment." *Id.* (quoting *Avila,* 165 Cal. App. 4th at 1247); *see also Serri v. Santa Clara Univ.,* 226 Cal. App. 4th 830, 861 (2014) (same).

An employer's true reasons, if nondiscriminatory, need not have been wise or correct. *Serri*, 226 Cal. App. 4th at 861. The ultimate issue is whether the employer acted with "*a motive to discriminate illegally*." *Id.* (emphasis in original). "If the employer meets its initial burden, the burden shifts to the employee to 'demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory animus, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful action.'" *Id.* (citation omitted)). "Rather it is incumbent upon the employee to produce 'substantial responsive evidence' demonstrating the existence of a material triable controversy as to pretext or discriminatory animus on the part of the employer." *Id.* at 862. The Ninth Circuit "has set a high standard for the granting of summary judgment in employment discrimination cases." *Schnidrig v. Columbia Mach.7, Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996).

/ / /

1           **1.**      **Adverse Employment Action**

2        Defendant argues that Plaintiff's stated reasons do not constitute adverse

3  employment action under FEHA because she did not suffer a tangible employment action

4  such as a firing, demotion, or reassignment. (Dkt. No. 21-1 at 20-21.) In response,

5  Plaintiff asserts that Defendant subjected her to the following adverse employment

6  actions, and taken together, demonstrate adverse employments actions: "(1) denying her

7  travel to trade shows; (2) threatening to demote her to an ICS position; (3) threatening to

8  place her on leave if she did not travel to Mexico; and (4) her boss, Mantanona, giving

9  her the silent treatment." (Dkt. No. 23 at 18.)

10       An adverse employment action "materially affect[s] the compensation, terms,

11  conditions, or privileges of . . . employment." *Chuang v. Univ. of California Davis, Bd.*

12  *of Trustees*, 225 F.3d 1115, 1126 (9th Cir. 2000). Adverse employment actions include

13  "assigning more, or more burdensome, work responsibilities" as well as "termination,

14  demotion, failing to promote, denial of an available job, adverse job assignments, official

15  discipline, and significant changes in compensation or benefits." *Davis v. Team Elec.*

16  *Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008); *Ayala v. Frito Lay, Inc.*, 263 F. Supp. 3d 891,

17  905 (E.D. Cal. 2017). "Mere ostracism" or minor conduct, however, does not constitute

18  an adverse employment action. *Davis*, 520 F. 3d at 1089; *see also Manatt v. Bank of*

19  *Am., NA,* 339 F.3d 792, 803 (9th Cir. 2003) (finding a supervisor's behavior of staring at

20  an employee "in an angry way" was mere ostracism); *Nunez v. City of Los Angeles*, 147

21  F.3d 867, 875 (9th Cir. 1998) (explaining that "[m]ere threats and harsh words are

22  insufficient" to establish an adverse employment action). Determining whether an

23  employment action is adverse depends on the facts of the case as "[c]ontext matters."

24  *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006).

25       The Ninth Circuit defines adverse employment actions broadly. *Ray v. Henderson*,

26  217 F.3d 1234, 1240-41 (9th Cir. 2000) (recognizing circuit split on what constitutes

27  adverse employment action and aligning itself with circuits that define it broadly). The

28  Ninth Circuit has considered the following as adverse employment actions: "a lateral

transfer, or refusing a lateral transfer; undeserved negative performance evaluations or job references if motivated by retaliatory animus and not promptly corrected; being excluded from meetings, seminars and positions that would have made plaintiff more eligible for salary increases; being denied secretarial support; eliminating job responsibilities; and failure to be promoted or be considered for promotion." *Shepard v. City of Portland*, 829 F. Supp. 2d 940, 960 (D. Or. 2011) (citing *Ray*, 217 F.3d at 1241). (citations omitted).  Moreover, a court can consider the "totality of the circumstances to determine whether an employee has been subject to treatment that materially affects the terms and conditions of employment.  *Yanowitz v. L'Oreal USA, Inc*., 36 Cal. 4th 1028, 1036, 1054-55 (2005) (rejecting employer's argument that it is improper to consider adverse actions collectively stating, "there is no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries.").  In *Yanowitz,* the California Supreme Court explained "Minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable, but adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion falls within the reach of the antidiscrimination provisions of sections 12940(a) and 12940(h)." *Id.* at 1054-55.

In this case, Plaintiff claims that the following acts, collectively, constitute an adverse employment action: (1) denying her travel to trade shows to New York in October 2018 and April 2019, to Germany in February 2019 and to Chicago in March 2019; (2) threatening to demote her to an ICS position; (3) threatening to place her on unpaid leave if she did not travel to Mexico; and (4) the silent treatment from Mantanona, her boss.  (Dkt. No. 23 at 18-19.)

In its motion, Defendant argues that Plaintiff did not suffer an adverse employment action by being denied the opportunity to attend trade shows because "[a]n employer's

refusal to pay to send an employee cross-country and to Europe until she fulfills the rest of her job duties is called managing" and she did not suffer any negative consequences. (Dkt. No. 21-1 at 21-22.)  In response, Plaintiff argues that she was prevented from fulling a requirement of her job, namely, attending trade shows.  (Dkt. No. 23 at 19.)

The record shows that Defendant denied her request to attend the trade show in New York in November 2018 unless she traveled to Mexico and subsequently Plaintiff was also denied attendance to the housewares show in Germany in February 2019, the housewares show in Chicago in March 2019, and the tabletop show in New York in April 2019 even though a large portion of Costco's global buyers attended.  (Dkt. No. 23-4, Gruenberg Decl., Ex. 2, Daleo Depo at 173:13-175:16.)  Plaintiff testified that attending trade shows was "an important part of [her] job because at these events, the global Costco Buying team would decide which items Costco would purchase for its stores."  (Dkt. No. 23-3, Gruenberg Decl., Ex. 1, Martinez Depo. at 82:4-17.)  Plaintiff's manager, Daleo, similarly testified that attending trade shows was important to succeed in her job and it was also a requirement of her position.  (Dkt. No. 23-4, Gruenberg Decl., Ex. 2, Daleo Depo. at 56:4-21.)  Plaintiff explains, in response to Defendant's claim she never submitted formal requests for subsequent trips after New York, that she did not submit those requests because "she knew, through Daleo, that Mantanona would deny them outright." (Dkt No. 23-3, Gruenberg Decl., Ex. 1, Martinez Depo. at 215:4-19, 218:18-219:5.)  For instance, Daleo testified she went to Mantanona several times to push for Plaintiff to attend the housewares show in Chicago in March 2019 because Daleo needed her there for coverage but he still denied the request.  (Dkt. No. 23-3, Gruenberg Decl., Ex. 1, Martinez Depo. at 215:4-19.)

Plaintiff has raised an issue of fact whether the denial of her travel to trade shows was an alleged adverse employment action because failure to attend hindered her success as a Buyer.  *See e.g. Burlington Northern and Santa Fe Ry. Co.*, 548 U.S. at 69 ("A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that

contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.").

Second, Defendant argues that the November 8 Memo where Costco told Plaintiff that if she did not travel to Mexico City, she would be given 60 days to find another position or move to ICS, was not an adverse employment action because she was never moved to the ICS position or demoted.  (Dkt. No. 21-1 at 21.)  In opposition, Plaintiff asserts that Defendant gave Plaintiff an ultimatum in this memo: either she must travel to Mexico three times per year or she will be demoted to an ICS position and this ultimatum constituted an adverse employment action.  (Dkt. No. 23 at 19.)

The Ninth Circuit has held that a mere threat of termination does not constitute an adverse employment action.  *Hellman v. Weisberg*, 3600 Fed. App'x 776, 779 (9th Cir. 2009); *Lewis v. United Parcel Serv.*, 252 Fed. App'x 806, 807 (9th Cir. 2007).  However, threats of demotions or reassignment of job duties have been held to constitute an adverse employment action.  *See McGuire v. Miami–Dade County*, 418 F. Supp. 2d 1354, 1359 (S.D. Fla. 2006) ("Viewing Plaintiff's allegation that she was threatened with demotion . . . in the light most favorable to the Plaintiff, this Court finds that this allegation is sufficient to meet the prima facie requirement that Plaintiff demonstrate an adverse employment action taken against her."); *Bergin v. N. Clackamas Sch. Dist.*, No. CV–03–1412–ST, 2005 WL 66069, at * 11 (D. Or. Jan. 12, 2005) (holding that "the threat of transfer was an adverse employment action").  The Supreme Court explained "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'"  *Burlington Northern and Santa Fe Ry. Co.*, 548 U.S. at 71.

Here, the Court construes the November 8 Memo as plan of action in the event Plaintiff decided she was unable to travel to Mexico which meant being demoted to an ICS position.  Contrary to Defendant's construction of the November 8 Memo as merely a discussion about future job changes, the Memo provides what would happen if Plaintiff

did not travel to Mexico.  In essence, the November 8 Memo was notifying her that she would be demoted to a non-management position with less pay unless she travelled to Mexico.  Therefore, Plaintiff has raised a triable issue on whether the November 8 Memo was an adverse employment action.

Third, Defendant argues that the leave of absence without pay is not a negative employment action because Costco granted her request for leave and the threatened leave of absence never materialized.  (Dkt. No. 21-1 at 21; Dkt. No. 25 at 4-5.)  Plaintiff responds that that there were two leave of absence incidents and the one she relies on to support her claim is the threatened unpaid leave of absence when Schmertzler spoke to her on February 11, 2019.  An unpaid leave of absence would have resulted in significant consequences to her employment, including a loss of income.  (Dkt. No. 23 at 19.)  She testified Costco was giving her an ultimatum, not options.  (Dkt. No. 23-3, Gruenberg Decl., Ex. 1, Martinez Depo at 264:20-266:5, 266:23-268:2, 270:20-271:24.)

On February 11, 2019, Plaintiff spoke with Schmertzler on the phone about her accommodations, and in an emailed dated February 13, 2019, Schmertzler memorialized the conversation and explained that travel to Mexico, three times a year, was an essential duty of her Mexico Buyer position.  (Dkt. No. 21-5, D's App'x Ex. No. 28 at 357.)  They also talked about any open and available positions that she could do temporarily that would not require travel to Mexico but there were none in San Diego.  (*Id.*)  As such, Plaintiff was going to be placed on a leave of absence for six months without pay which would begin at the end of the following week.  (*Id.*)  This conversation caused Plaintiff to suffer severe anxiety and stress, which resulted in her doctor placing her on medical leave on February 22, 2019.  (Dkt. No. 21-3, Gruenberg Decl., Ex. 1, Martinez Depo. at 272:22-275:7.)  Similar to the November 8 Memo, the conversation with Schmertzler provided Plaintiff a plan of action concerning her employment if she refused to travel to Mexico.  This time it would be an unpaid leave of absence for six months effective the following week.  Therefore, it is for the jury to determine whether these actions, a reduction in pay and a loss in pay, constitute adverse employment actions.

Finally, Defendant argues that Mantanona's failure to speak with her or visit her office does not constitute a negative material change in the terms of her employment. (Dkt. No. 21-2 at 21.)  Plaintiff argues that after she complained about the lack of safety protocols, Mantanona's decision to stop coming to her office and stop talking to her creates triable issues.  (Dkt. No. 23 at 19-20; Dkt. No. 23-3, Gruenberg Decl., Ex. 1, Martinez Depo. at 288:11-15; 293:5-18.)  However, Plaintiff provides no other facts demonstrating that this conduct impaired her job performance or prospects for advancement or promotion.  Accordingly, the silent treatment by Mantanona does not constitute an adverse action.  *See Kim v. Prudential Fin., Inc*., Civ. No. 3:15-cv-2029-PA2016 WL 2595477, at *7 (D. Or. May 4, 2016) ("Plaintiff cannot . . . rely on being ignored at social functions or being given the cold shoulder or the silent treatment to sustain a retaliation claim.").

Accordingly, in sum, the Court concludes that Plaintiff has raised a genuine issue of fact whether she suffered adverse employment actions.

### 2.    Non-Discriminatory Reasons

Defendant further asserts that Costco can articulate non-discriminatory reasons for Plaintiff's treatment.  (Dkt. No. 21-1 at 22.)  First, Costco "believes" travel to Mexico is an essential function of the Mexico Buyer job and gave Plaintiff at least two options for proceeding if she did could not travel to Mexico.  (*Id.*)  Second, Plaintiff's leave of absence was requested by Plaintiff which Costco granted.  (*Id*.)  Third, "Mantanona oversees over 200 employees and generally relies on his GMMs, in this case, Daleo, to communicate directly with the Buyers under their supervision.  (*Id*.)  Fourth and finally, since Plaintiff had not traveled to Mexico since late 2017, "Costco elected not to incur the expenses in sending her on additional non-Mexico travel as a way to encourage her to fulfill her Mexico travel duties."  *Id*.  In fact, Plaintiff never submitted the required written requests for them and were never denied.

In response, Plaintiff provides evidence that Costco's stated reasons are pretextual. While Costco claims that she was denied permission to attend trade shows because she

had not traveled to Mexico since 2017, she presents evidence that she was singled out as there were other assistant buyers who were approved to attend travel shows who had never traveled to Mexico.  First, Daleo testified that there were other assistant buyers or buyers who had never traveled to Mexico but were approved travel to the trade show in New York.  (Dkt. No. 23-4, Gruenberg Decl., Ex. 2, Daleo Depo. at 61:12-16.) Mantanona testified that at the time he denied Plaintiff's travel request, he did not know if other buyers had not been to Mexico.  (Dkt. No. 23-4, Gruenberg Decl., Ex. 3, Mantanona Depo. at 34:2-16.)  However, since that time, in late 2018, he learned that other assistant buyers had not travelled to Mexico but were allowed to attend trade shows and he acknowledged that he did not implement travel restrictions on them.  (*Id.* at 35:8-41:13.)  When Mantanona learned other buyers had not been to Mexico, he did not rescind their travel approval.  (*Id.* at 41:2-5.)  He also testified that they did not complain about safety protocols in Mexico.  (*Id.* at 41:6-13.)  Mantanona also testified that he did not notify any other members of the buying team that he would not approve travel until they arranged a trip to Mexico.  (*Id.* at 31:2-5.)

Moreover, when Plaintiff tried to comply with Mantanona's condition of travel to Mexico, she looked into booking travel to a Mexican border town but she was told that Mantanona did not consider border town trips to qualify as a trip to Mexico, but instead she was required to go to Mexico City.  (Dkt. No. 23-3, Gruenberg Decl., Ex. 1, Martinez Depo. at 125:6-25.)  Daleo testified that the requirement to travel to Mexico City was odd because other buyers would satisfy their Mexico travel by going to the border towns. (Dkt. No. 23-4, Gruenberg Decl., Ex. 2, Daleo Depo. at 101:2-14.)

As to the threat of demotion if Plaintiff did not travel to Mexico and threat to place her on unpaid leave if she did not travel to Mexico, Plaintiff presents evidence that this policy of travel was new and she had not seen it applied to other employees.  (Dkt. No. 23-4, Gruenberg Decl., Ex. 2, Daleo Depo. at 57:4-7; 130:7-131:21.)  Moreover, Defendant's argument concerning the approval of Plaintiff's request for leave of absence which occurred on February 28, 2019 is misplaced as Plaintiff's argument concerning

discrimination is based on the leave of absence she was going to be forced to take if she did not travel to Mexico that Schmertzler communicated to her on February 11, 2019. Defendant has not provided a non-discriminatory reason for the leave of absence communicated by Schmertzler.

Plaintiff has satisfied her burden of producing "substantial responsive evidence" that the employer's stated reasons were pretextual. *See Serri*, 226 Cal. App. 4th at 862. Accordingly, the Court DENIES Defendant's motion for summary judgment on the disability discrimination pursuant to FEHA.

## C.    Fourth Cause of Action - Retaliation and Constructive Discharge under FEHA

Defendant moves to summarily adjudicate Plaintiff's claim for "retaliation and wrongful constructive discharge" under the Fair Employment and Housing Act ("FEHA"). Plaintiff opposes.

### 1.    Retaliation

Under the FEHA, it is unlawful for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." Cal. Gov't Code § 12940(h). To establish a claim for retaliation under the FEHA, Plaintiff must show (1) she engaged in a protected activity; (2) she was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action. *Yanowitz v. L'Oreal USA, Inc*., 36 Cal. 4th 1028, 1042 (2005). "Protected activity" means that the employee "has opposed any practices forbidden under [FEHA] . . . or has filed a complaint, testified, or assisted in any proceeding under [FEHA]." Cal. Gov. Code § 12940(h).

As with the disability discrimination cause of action, analysis of the FEHA retaliation cause of action proceeds under the *McDonnell Douglas* burden-shifting framework. *Washington v. California City Correction Ctr*., 871 F. Supp. 2d 1010, 1027 (E.D. Cal. 2012); *Navarro v. DHL Glob. Forwarding*, No. 215CV05510CASEX, 2017

WL 901880, at *9 (C.D. Cal. Mar. 6, 2017).  Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action.  *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 68 (2000).  If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation "drops out of the picture," and the burden shifts back to the employee to prove intentional retaliation.  *Id.*

Defendant claims that Plaintiff's FEHA retaliation is based on the complaint she lodged on January 31, 2019[2] about alleged retaliation by Mantanona.  (Dkt. No. 21-1 at 24.)  In response, Plaintiff does not address the January 31, 2019 complaint against Mantanona but argues her retaliation claim is based on her repeatedly raising concerns about travel safety to Mexico since August 2017 when she unsuccessfully tried to arrange a travel safety class to come to San Diego.  (Dkt. No. 23 at 25.)  She claims that it was her opposition to discrimination by Defendant that resulted in retaliation and her request for an accommodation for a disability is a protected activity sufficient to demonstrate retaliation in violation of FEHA.  In reply, Defendant argues that a claim for retaliation for requesting accommodation falls under section 12940(m)(2)[3], not section 12940(h); as such, Plaintiff cannot allege a claim not raised in the complaint.

Here, a retaliation claim may be brought if an employee has opposed any discriminatory practices barred by FEHA and in this case, Plaintiff claims that she was subject to retaliatory actions by her continued complaints or opposition to Costco's safety protocol for travel to Mexico due to her disability which constitutes a protected activity under FEHA. Accordingly, the Court conclude that Plaintiff has alleged she was engaged in protected activity.  Because Plaintiff's theory of the retaliation claim is based on the

---

[2] Plaintiff testified that the complaint was lodged on January 28, 2019.  (Dkt. No. 21-5, McConnell Decl., Ex. 1 at 228:11-20.)

[3] Section 12940(m)(2) provides it is unlawful, "For an employer or other entity covered by this part to, in addition to the employee protections provided pursuant to subdivision (h), retaliate or otherwise discriminate against a person for requesting accommodation under this subdivision, regardless of whether the request was granted."  Cal. Gov't Code § 12940(m)(2).

same facts underlying the disability discrimination claim, the Court necessarily concludes that Plaintiff has raised an issue of fact whether she suffered an adverse employment action and whether Costco's non-retaliatory reasons are pretext.  The Court DENIES Defendant's motion for summary judgment on the retaliation claim.

### 2.    Constructive Discharge

Defendant moves for summary judgment on the constructive discharge claim because Plaintiff began applying for jobs starting in December 2018 while she was on leave and she has not demonstrated that his working conditions were so intolerable and aggravated that a reasonable person would be compelled to resign.  Plaintiff contends there are genuine issues of material fact that he was subject to constructive discharge.

"Constructive discharge occurs when the employer's conduct effectively forces an employee to resign." *Turner v. Anheuser-Busch, Inc.,* 7 Cal. 4th 1238, 1244 (1994).  An "employee must plead and prove . . . that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." *Id.* at 1251. Also, the "requisite knowledge or intent must exist on the part of either the employer or those persons who effectively represent the employer, i.e., its officers, directors, managing agents, or supervisory employees." *Id.*  It is an objective standard inquiring "whether a reasonable person faced with the allegedly intolerable employer actions or conditions of employment would have no reasonable alternative except to quit." *Id.* at 1248.

"Whether conditions were so intolerable or aggravated under that standard is usually a question of fact; however, summary judgment against an employee on a constructive discharge claim is appropriate when, under the undisputed facts, the decision to resign was unreasonable as a matter of law." *Scotch v. Art Inst. of California-Orange Cnty., Inc*., 173 Cal. App. 4th 986, 1022 (2009).  "The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal

motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer.  The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee." *Turner,* 7 Cal. 4th at 1246.  The standard "is an objective one, and the proper focus is on the working conditions themselves."  *Simers v. Los Angeles Times Comm'ns, LLC*, 18 Cal. App. 5th 1248, 1270 (2018).  "A constructive discharge occurs when, looking at the totality of circumstances, 'a reasonable person in [the employee's] position would have felt that he was forced to quit because of intolerable and discriminatory working conditions.'"  *Watson v. Nationwide Ins. Co*., 823 F.2d 360, 361 (9th Cir.1987) (quoting *Satterwhite v. Smith*, 744 F.2d 1380, 1381 (9th Cir. 1984)).

Plaintiff responds that she gave notice of her resignation on March 7, 2019 and she was forced to leave after months of ongoing discrimination and retaliation and Costco forced her to take an unpaid leave of absence and failed to remedy the alleged illegal retaliation she endured.  The Court concludes that Plaintiff has set forth facts to create a genuine issue of material fact whether her resignation constituted constructive discharge.  Due to the unexpected demands of required travel to Mexico, and Defendant's alleged failure to accommodate Plaintiff by implementing official safety protocols, and their effect on her job success, her disability worsened.  While Plaintiff attempted to comply and scheduled a trip to Mexico in November 2018, in the end, she had to cancel the trip and was placed on medical leave for anxiety and depression starting November 9, 2018 through January 14, 2019.  Then when she returned, the continued pressure to travel to Mexico combined with the potential demotion and later potential unpaid leave, created additional anxiety and stress causing her to go on medical leave for six months on February 22, 2019.  These facts raise a question whether the conditions at her work were intolerable.  *See e.g. White v. Honeywell, Inc*., 141 F.3d 1270, 1279 (8th Cir. 1998) ("We are not prepared to say that 'quit' is the magic word in a constructive discharge instruction.  A person who has suffered a forced unpaid medical leave of absence, from which she is unable to return and which resulted from objectively intolerable working

conditions, is in no better position than one who was forced to quit as a result of objectively intolerable conditions."); *Violan v. On Lok Senior Health Servs*., No. 12-CV-05739 WHO, 2013 WL 6907153, at *13 (N.D. Cal. Dec. 31, 2013) ("Courts have denied summary judgment on constructive termination claims where the plaintiff has not formally resigned and is on an extended medical leave of absence."); *Siraj v. Bayer Healthcare LLC*, No. 09–00233, 2010 WL 889996 (N.D. Cal. Mar. 8, 2010) (denying summary judgment on constructive discharge claim where plaintiff "remains on medical leave of absence until she is able to perform the essential functions of her position"); *Llewellyn v. Celanese Corp.,* 693 F. Supp. 369, 381 (W.D.N.C. 1988) ("Even though Ms. Llewellyn did not quit, her medical leave without pay was caused by her intolerable work situation."). Accordingly, the Court DENIES summary judgment on the constructive discharge claim.

**D. Third Cause of Action- Failure to Engage in the Interactive Process**

Defendant argues that Plaintiff cannot establish that Costco did not engage in the interactive process timely and in good faith to explore reasonable accommodations and the record shows that it repeatedly tried to engage with her. When Costco found out about Plaintiff's disability in January 2019 when she submitted her doctor's note, it assigned her to work with Schmertzler, the Director of Integrated Leave, and granted her request for medical leave. In response, Plaintiff alleges that Defendant's duty to engage in the interactive process was triggered years earlier and Costco failed to engage in the interactive process concerning her safety concerns of traveling to Mexico. In fact, her supervisor learned about her anxiety about twelve years ago and knew she was diagnosed with anxiety well before Plaintiff took her leave of absence in November 2018. Because Defendant knew about her disability prior to January 2019, Costco had a duty initiate the interactive process years earlier.

Under the FEHA, it is unlawful for an employer to "fail to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an

employee or applicant with a known physical or mental disability or known medical condition." Cal. Gov. Code § 12940(n). The duty to engage in the interactive process is generally "triggered upon notification of the disability and the desire for accommodation." *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002) (citations omitted). An "employer has a mandatory obligation to engage in the interactive process and that this obligation is triggered either by the employee's request for accommodation or by the employer's recognition of the need for accommodation." *Barnett v. U.S. Air, Inc*., 228 F.3d 1105, 1112 (9th Cir. 2000), *rev'd on other grounds*, 535 U.S. 391 (2002). The interactive process requires both the employer and the employee to engage in good faith in order to "clarify what the individual needs and identify the appropriate accommodation." *Id.* (quoting Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, EEOC Compliance Manual (CCH), § 902, No. 915.002 (Mar. 1, 1999), at 5440). While the employer's participation is necessary because it has "superior knowledge regarding the range of possible positions and can more easily perform analyses regarding the 'essential functions' of each," the employee's involvement is also important because she generally knows more about her capabilities, and "holds essential information for the assessment of the type of reasonable accommodation which would be most effective." *Id.* at 1113.

Here, while Defendant claims it did not know about her disability until the doctor's note in January 2019, Plaintiff has presented evidence that Defendant knew about Plaintiff's disability years before 2018 and has generated a genuine dispute of material fact as to when the duty to engage in the interactive process was triggered. *See Dunlap v. Liberty Natural Prods*., Inc., 878 F.3d 794, 799 (9th Cir. 2017) (finding that defendant failed to engage in the interactive process where the evidence reflected that defendant had prior notice of plaintiff's limitations, refused to consider or implement her proposed accommodations, and failed to articulate any undue hardship). Accordingly, the Court DENIES Defendant's motion for summary judgment on this claim.

**E.      Fifth Cause of Action - Failure to Prevent Discrimination**

In one sentence, Defendant summarily argues that because Plaintiff has failed to prove disability discrimination, her claim for failure to prevent discrimination necessarily fails.  However, because the Court DENIES Defendant's motion on disability discrimination, the Court also DENIES Defendant's motion for summary judgment on the failure to prevent discrimination.

**F.   Sixth Cause of Action – Retaliation under California Labor Code section 1102.5**

Defendant argues that the claim for retaliation under Labor Code section 1102.5 fails because Plaintiff cannot show she made any complaints that she reasonably believed implicated a statutory offense.  (Dkt. No. 21-1 at 25-26.)  Plaintiff disagrees.

Labor Code section 1102.5 provides, in relevant part, that

> (b) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

Cal. Labor Code § 1102.5(b).  A section 1102.5(b) retaliation cause of action requires that: "(1) the plaintiff establish a prima facie case of retaliation, (2) the defendant provide a legitimate, nonretaliatory explanation for its acts, and (3) the plaintiff show this explanation is merely a pretext for the retaliation." *Patten v. Grant Joint Union High Sch. Dist.*, 134 Cal. App. 4th 1378, 1384 (2005).  To establish a prima facie case for retaliation, a plaintiff must show that "(1) she engaged in a protected activity, (2) her employer subjected her to an adverse employment action, and (3) there is a causal link between the two." *Id.*

28

Defendant contends that Plaintiff's reliance on California Code of Civil Procedure 527.8[4] and Labor Code section 6400(a) in her complaint to support this claim are without merit.  Particularly as to section 6400(a), Defendant argues that the provision is inapplicable because it only applies to safety regarding employment in California and not in a foreign country, Mexico, citing Labor Code section 6307[5].  In response, Plaintiff does not disagree that California Code of Civil Procedure section 527.8 does not apply to her cause of action but instead argues that section 6400(a) applies.  (Dkt. No. 23 at 28-29.)  Plaintiff responds that she need only show that she believed there was a violation of section 6400, not that there was an actual violation and there is plenty of evidence that she believed Costco forced her to work in an unsafe environment.

Section 6400(a) provides that "[e]very employer shall furnish employment and a place of employment that is safe and healthful for the employees therein."  Cal. Labor Code § 6400(a).  Courts have found that California Labor Code section 6400 establishs a general public policy requiring employers to provide a safe and secure workplace. *Franklin v. The Monadncock Co*., 151 Cal. App. 4th 252 (2007) (finding public policy, when read alongside California Civil Procedure Code section 527.8, requiring employers to maintain safe and secure workplace).

Irrespective of Defendant's argument that section 6400(a) only applies to safety for places of employment in California, Plaintiff argues, and the statute provides that a

---

[4] California Code of Civil Procedure section 527.8 provides that

> Any employer, whose employee has suffered unlawful violence or a credible threat of violence from any individual, that can reasonably be construed to be carried out or to have been carried out at the workplace, may seek a temporary restraining order and an order after hearing on behalf of the employee and, at the discretion of the court, any number of other employees at the workplace, and, if appropriate, other employees at other workplaces of the employer.

Cal. Code Civ. Proc. § 527.8(a).

[5] Section 6307 provides that "[t]he division has the power, jurisdiction, and supervision over every employment and place of employment *in this state*, which is necessary to adequately enforce and administer all laws and lawful standards and orders, or special orders requiring such employment and place of employment to be safe, and requiring the protection of the life, safety, and health of every employee in such employment or place of employment."  Cal. Labor Code § 6307 (emphasis added).

protected activity exists "where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute."  Cal. Labor Code § 6400(a). Therefore, Plaintiff need not show there was an actual violation of section 6400 but only that she believed that there was a violation.  *See Devlyn v. Lassen Municipal Util. Dist.,* 737 F. Supp. 2d 1116, 1124 (E.D. Cal. 2010).  Here, Plaintiff has raised an issue of fact whether she was engaged in protected activity.  Moreover, because the retaliation claim is also based on the same facts as the disability discrimination claim, Plaintiff has necessarily provided evidence to establish a genuine issue of material fact whether she was subject to adverse employment actions, and whether Defendant's reasons were nonretaliatory.

Thus, the Court DENIES summary judgment on the sixth cause of action for retaliation under California Labor Code section 1102.5

## G. Seventh Cause of Action – Negligent Supervision

Defendant argues that the negligent supervision claim fails because it was not aware of any particular risk or hazard of Mantanona being likely to take action based on an employee's disability.  (Dkt. No. 21-1 at 29.)  In opposition, Plaintiff argues that Costco was negligent in hiring and retaining Mantanona despite numerous complaints lodged against him.  (Dkt. No. 23 at 29.)

"[A]n employer can be liable to a third person for negligently hiring, supervising, or retaining an unfit employee.  Liability is based upon the facts that the employer knew or should have known that hiring the employee created a particular risk or hazard and that particular harm materializes." *Alexander v. Community Hosp. of Long Beach*, 46 Cal. App. 5th 238, 264 (2020) (quoting *Doe v. Capital Cities*, 50 Cal. App. 4th 1038, 1054 (1996)); *Phillips v. TLC Plumbing, Inc*., 172 Cal. App. 4th 1133, 1139 (2009) ("An employer may be liable to a third person for the employer's negligence in hiring or retaining an employee who is incompetent or unfit. [Citation.]").

Here, in support of her argument, Plaintiff primarily relies on complaints made by her against Mantanona for retaliation and discrimination based on disability; she does not

provide evidence of Costco's prior knowledge of Mantanona's propensity to discriminate against persons with disability.  Moreover, Plaintiff argues that Costco was aware of at least three other employees who had lodged complaints against Mantanona; however, the prior other complaints against Mantanona were about how he treated women poorly, and not because of a disability.  (Dkt. No. 23-4, Gruenberg Decl., Ex. 2, Daleo Depo. at 160:16-20; 160:23-161:9; 164:1-16.)

Plaintiff has not raised an issue of material fact that Costco had prior knowledge as to Mantanona's propensity to discriminate against persons with disabilities.  Accordingly, the Court GRANTS Defendant's motion for summary judgment on the negligent supervision cause of action.

## H.    Eighth Cause of Action - Intentional Infliction of Emotional Distress

Defendant moves for summary judgment on the intentional infliction of emotional distress ("IIED") cause of action arguing that it is preempted by the Workers Compensation Act ("WCA") and fails to create a triable issue of fact that Defendant's conduct was "extreme or outrageous."  (Dkt. No. 21-1 at 29-31.)  In response, Plaintiff submits that claims of discriminatory conduct are not preempted by the WCA and the conduct at issue was "severe and outrageous."  (Dkt. No. 23 at 29-31.)

### 1.    WCA Preemption

Under California law, claims for IIED based solely on normal conditions of employment must be pursued through workers' compensation.  *See* Cal. Lab. Code § 3601(a) ("[T]he right to recover such compensation, pursuant to the provisions of this division is . . . the exclusive remedy for injury or death of an employee against any other employee of the employer acting within the scope of his or her employment."); *Cole v. Fair Oaks Fire Protection Dist.,* 43 Cal. 3d 148, 160 (1987) ("[W]hen the misconduct attributed to the employer is actions which are a normal part of the employment relationship, such as demotions, promotions, criticism of work practices, and frictions in negotiations as to grievances, an employee suffering emotional distress causing disability may not avoid the exclusive remedy provisions of the Labor Code by characterizing the

employer's decisions as manifestly unfair, outrageous, harassment, or intended to cause emotional disturbance resulting in disability."). The California Supreme Court has held that "injuries arising from termination of employment ordinarily arise out of and occur in the course of the employment" and are therefore, generally subject to the exclusive remedy provisions of the Workers Compensation Act. *Shoemaker v. Myers*, 52 Cal. 3d 1, 19-20 (1990); *see also Miklosy v. Regents of Univ. of Cal.,* 44 Cal. 4th 876, 905 (2008) ("The alleged wrongful conduct, however, occurred at the worksite, in the normal course of the employer-employee relationship, and therefore workers' compensation is plaintiffs' exclusive remedy for any injury that may have resulted."). That limitation does not apply, however, when the "injury is a result of conduct, whether in the form of discharge or otherwise, not seen as reasonably coming within the compensation bargain." *Shoemaker*, 52 Cal. 3d at 20; *see Kovatch v. California Case Mgmt. Co.*, 65 Cal. App. 4th 1256, 1277 (1998) (holding that the Workers' Compensation Act does not preempt intentional infliction of emotional distress claims predicated upon wrongful termination in violation of public policy).

Where there remains a claim for disability discrimination, courts have held that an IIED claim is not preempted by the WCA. *See Charles v. ADT Sec. Servs.*, No. CV 09-5025 PSG (AJWx), 2009 WL 5184454, at *3 (C.D. Cal. Dec.21, 2009) (concluding that the presence of alleged disability discrimination takes Plaintiff's case "out from under" the workers' compensation exclusivity provisions); *Barsell v. Urban Outfitters, Inc*., No. CV 09-02604 MMM (RZx), 2009 WL 1916495, at *4 (C.D. Cal. July 1, 2009) ("Because the claim is based on allegations of disability discrimination, there is a non-fanciful possibility that the workers' compensation exclusivity provisions" do not bar the claim against the defendant.); *Accardi v. Superior Ct.*, 17 Cal. App. 4th 341, 352-53 (1993) (workers' compensation not the exclusive remedy for emotional distress claim based on sexual harassment discrimination in violation of the FEHA); *Murray v. Oceanside Unified School Dist*., 79 Cal. App. 4th 1338, 1362 (2000) (citation omitted) ("claim for

emotional and psychological damage, arising out of employment, is not barred where the distress is engendered by an employer's illegal discriminatory practices").

Here, Plaintiff alleges disability discrimination which constitutes illegal conduct not contemplated by the compensation bargain. *See Vanderhule v. Amerisource Bergen Drug Corp.*, No. SACV 16-2104 JVS (JCGx), 2017 WL 168911, at *4 (C.D. Cal. Jan. 17, 2017) ("[C]ourts have held that IIED claims are not preempted by the Workers Compensation Act when they involve separate discrimination claims, such as allegations that an employer discriminated against the plaintiff by refusing to provide medical leave for a disability."); *see also Zolensky v. Am. Medflight, Inc.*, No. 2:16-cv-00788-KJM-KJN, 2017 WL 1133926, at *7-8 (E.D. Cal. Mar. 27, 2017) (finding that the exception did not apply in that case because the plaintiff did not allege discrimination based on race, religion, age, gender, or the like).

Defendant's citation of cases in its reply, (Dkt. No. 25 at 10), are not supportive as both cases involved dismissal of the discrimination claim with a remaining IIED claim. *See Aviles v. Alutiiq Sec. & Tech.*, CASE NO. 10-CV-2589-H (NLS), 2012 WL 12905874, at *7 (S.D. Cal. June 15, 2012) (remaining IIED claim preempted by WCA after granting summary judgment on disability discrimination claim); *Plummer v. Tesoro Refining & Mktg. Co.* CASE NO.: CV 16-02044 SJO (JEMx), 2016 WL 3180327, at *4 (C.D. Cal. June 3, 2016) (IIED claim preempted by WCA where underlying age harassment claim dismissed).  Accordingly, the Court concludes that the exclusivity provision of the WCA does not preempt the IIED claim.

### 2.    Merits of IIED Claim

Defendant challenges the first factor that the alleged extreme and outrageous conduct are personnel actions taking during the process of addressing Plaintiff's safety concerns which included imposing and enforcing a job requirement, identifying job options, and discussing and approving a leave of absence based on her doctor's notes. Plaintiff argues that Mantanana, as her boss, used his position to single her out for discriminatory and retaliatory action.

The tort of intentional infliction of emotional distress is comprised of three elements: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff suffered severe or extreme emotional distress; and (3) the plaintiff's injuries were actually and proximately caused by the defendant's outrageous conduct. *Hughes v. Pair*, 46 Cal. 4th 1035, 1050. (2009). The California Supreme Court has set a "high bar" to demonstrate severe emotional distress. *Id.* at 1051. "Severe emotional distress means 'emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it.'" *Id.* (citation omitted).

Personnel decisions "[are] insufficient to support a claim of intentional infliction of emotional distress, even if improper motivation is alleged." *Janken v. GM Hughes Elecs.*, 46 Cal. App. 4th 55, 80 (1996) ("A simple pleading of personnel management activity is insufficient to support a claim of intentional infliction of emotional distress, even if improper motivation is alleged."). However, personnel management actions would be unlawful if motivated by prohibited discriminatory considerations. *Id.* at 79.

Here, the allegations of Defendant's conduct involve personnel management actions; however, Plaintiff alleges discriminatory motive behind those actions. Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff has raised a triable issue of fact on the IIED claim and DENIES summary judgment on the IIED claim.

## I.   Prayer for Punitive Damages

Defendant moves to dismiss the punitive damages as a prayer for relief because Plaintiff cannot show by "clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice." (Dkt. No. 21-1 at 31.) Plaintiff contends that punitive damage is a question for the jury and a reasonable jury could conclude that by singling Plaintiff out, requiring her to travel to Mexico, ignoring her right to an accommodation and the interactive process, and subjecting her to discrimination and retaliation, Mantanona acted in conscious disregard of her rights. (Dkt. No. 23 at 31.)

Punitive damages are recoverable "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294. Punitive damages are recoverable for FEHA violations. *Commodore Home Systems, Inc. v. Superior Ct.*, 32 Cal.3d 211, 221 (1982). When the defendant is a corporation, "the evidence must demonstrate an officer, director or managing agent of Defendant committed, authorized or ratified an act of malice, oppression or fraud to create a genuine issue of material fact on punitive damages." *Yeager v. Corr. Corp. of Am.*, 944 F. Supp. 2d 913, 931 (E.D. Cal. 2013).

Because the Court denies summary judgment on the claims for disability discrimination, retaliation, failure to prevent discrimination and failure to engage in the interactive process, the Court also DENIES summary judgment on Plaintiff's prayer for punitive damages as premature. *See McInteer v. Ashley Distrib. Servs., Ltd.*, 40 F. Supp. 3d 1269, 1295 (C.D. Cal. 2014) ("Because Plaintiff's FEHA claim for disability discrimination survives summary judgment, the Court finds it would be premature to dismiss his request for punitive damages."); *Elliott v. QF Circa 37, LLC*, Case No. 16-cv-0288-BAS-AGS2018 WL 2933467, at *23 (S.D. Cal. June 12, 2018) (denying summary judgment on punitive damages premature as the plaintiff has provided sufficient evidence to survive summary judgment). As such, the Court DENIES summary judgment on Plaintiff's prayer for punitive damages.

## Conclusion

Based on the reasoning above, the Court GRANTS in part and DENIES in part Defendant's motion for summary judgment. The Court GRANTS summary judgment on the seventh cause of action or negligent supervision and DENIES summary judgment on the remaining claims.

IT IS SO ORDERED.

Dated:  August 21, 2020

Hon. Gonzalo P. Curiel
United States District Judge